UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>THE PEOPLE OF THE STATE OF NEW YORK, by Letitia James, Attorney General of the State of New York,<br><br>THE COMMONWEALTH OF VIRGINIA, *ex rel*. Mark R. Herring, Attorney General,<br><br>STATE OF MINNESOTA, by its Attorney General Keith Ellison, and<br><br>GURBIR S. GREWAL, Attorney General of the State of New Jersey, and PAUL R. RODRÍGUEZ, Acting Director of the New Jersey Division of Consumer Affairs,<br><br>    Plaintiffs,<br><br>      v.<br><br>Outreach Calling, Inc., a Nevada corporation, also dba Market Process Group;<br><br>Outsource 3000, Inc., a New Jersey corporation, also dba Outreach Calling, Inc.;<br><br>Production Consulting Corp., a Delaware corporation, also dba Outreach Calling, Inc. and 7 Production Consulting;<br><br>Thomas Berkenbush, individually and as an officer of Outreach Calling, Inc.;<br><br>William English, individually and as an officer of Outreach Calling, Inc.;<br><br>Mark Gelvan, individually and as an owner and officer of Outreach Calling, Inc., Outsource 3000, Inc., and Production Consulting Corp.; and<br><br>Damian Muziani, individually and as an officer of Outreach Calling, Inc.<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC"); the State of New York, by its Attorney General, Letitia James; the Commonwealth of Virginia, by, through, and at the relation of its Attorney General, Mark R. Herring; the State of Minnesota, by its Attorney General, Keith Ellison; and Gurbir S. Grewal, Attorney General of the State of New Jersey, and Paul R. Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs"), for their Complaint allege:

## SUMMARY OF THE CASE

1.      Since at least 2010, Defendants, led by Mark Gelvan, have operated a deceptive fundraising scheme that solicits donations on behalf of sham charities.  Defendants have bilked tens of millions of dollars from well-meaning American donors on behalf of sham charities, including the National Vietnam Veterans Foundation, Inc.; Breast Cancer Survivors Foundation, Inc.; Reserve Police Officers Association; Disabled Police and Sheriffs Foundation, Inc.; Center for American Homeless Veterans, Inc.; and Crisis Relief Network, Inc.

2.      Defendants, through telemarketing and mailings, promise prospective donors that their charitable contributions will support worthy causes, such as care packs to Vietnam veterans in need, transitional facilities for homeless veterans, and grants to family members of fallen officers.  In truth, the Defendants have fundraised for sham charities, several of which have been shut down through state and federal enforcement actions.  Only a fraction of each donated dollar—typically no more than 5%, if that—is spent on the stated charitable programs, while 85-90% is distributed to for-profit companies that primarily benefit Gelvan.  The operators of the sham charities for which Defendants fundraise typically spend the majority of the remaining funds to pay themselves and family members, and for administrative costs.

1

3.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and Section 6 of the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101 - 6108, to

obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of

contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other

equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15

U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled Telemarketing Sales

Rule ("TSR" or "Rule"), 16 C.F.R. Part 310.

4.      The State of New York ("New York") brings this action under New York

Executive Law ("N.Y. Exec. Law") §§ 63(12), 171-a, 172-d, 173-a, 175, and New York General

Business Law ("N.Y. Gen. Bus. Law") § 349.

5.      The Commonwealth of Virginia ("Virginia") brings this action under the Virginia

Solicitation of Contributions law, Virginia Code §§ 57-48 to 57-69.

6.      The State of Minnesota, by its Attorney General Keith Ellison ("Minnesota"),

brings this action under Minnesota Statutes § 8.31, the Minnesota Charitable Solicitation Act,

Minn. Stat. §§ 309.50 to 309.61, and the Minnesota Deceptive Trade Practices Act, Minn. Stat.

§§ 325D.43 to 325D.48.

7.      Gurbir S. Grewal, Attorney General of the State of New Jersey, and Paul R.

Rodríguez, Acting Director of the New Jersey Division of Consumer Affairs ("New Jersey"),

bring this action under the New Jersey Consumer Fraud Act ("New Jersey CFA" or "NJCFA"),

N.J.S.A. 56:8-1 to -20, and the Charitable Registration and Investigation Act ("New Jersey

CRIA" or "NJCRIA"), N.J.S.A. 45:17A-18 to -40.

8.     Plaintiffs New York, Virginia, Minnesota, and New Jersey also bring this action

pursuant to Section 6103(a) of the Telemarketing Act, which authorizes attorneys general to

initiate federal district court proceedings and seek to enjoin violations of, and enforce

compliance with, the TSR, to obtain damages, restitution, and other compensation, and to obtain

such further and other relief as the court may deem appropriate to stop Defendants' violations of

the TSR. 15 U.S.C. § 6103(a).

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over the federal law claims pursuant to

15 U.S.C. §§ 45(a), 53(b), 57(b), 6102(c), 6103(a), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a),

and 1345.

10.     This Court has supplemental jurisdiction over Plaintiffs New York, Virginia,

Minnesota, and New Jersey's state law claims under 28 U.S.C. §1367.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), and (d), and

15 U.S.C. §§ 53(b) and 6103(e).

## PLAINTIFFS

12.     The FTC is an independent agency of the United States Government created by

statute.  15 U.S.C. §§ 41 to 58.  The FTC enforces Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108.  Pursuant to the

Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which

prohibits deceptive and abusive telemarketing acts or practices.

3

13.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b, and 6105.

14.     New York, by its Attorney General, is authorized to bring an action to enjoin persistent fraud or illegality in the carrying on, conducting, or transaction of business, N.Y. Exec. Law § 63(12), and deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York, N.Y. Gen. Bus. Law § 349, and to seek an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, and directing restitution and damages and other relief as may be deemed proper, N.Y. Exec. Law § 63(12); N.Y. Gen. Bus. Law § 349.  Pursuant to the N.Y. Exec. Law Article 7-A, the New York Attorney General is responsible for overseeing charitable solicitation in New York through a system of mandatory financial disclosures and reporting, and is authorized to bring an action to enjoin violations of Article 7-A, including bringing an action to enjoin a charitable organization and/or persons acting for it or on its behalf from continuing the solicitation or collection of funds, to cancel any registration statement previously filed with the Attorney General, and to secure an order awarding restitution and damages, penalties, and costs; to remove any director or other person responsible for the violation of Article 7-A; to dissolve a corporation and other relief as appropriate.  N.Y. Exec. Law § 175(2).

15.     Virginia, by its Attorney General, is authorized to bring an action in the name of the Commonwealth against any charitable or civic organization, commercial co-venturer,

professional fund-raising counsel, or professional solicitor, or their officers, directors, or other agents to enjoin any violation of Chapter 5 of Title 57 of the Code of Virginia, Va. Code Ann. §§ 57-48 to 57-69 and is authorized to obtain such other relief as the court deems appropriate.  Va. Code Ann. § 57-59(D).  In any such action, the court may also award to the Commonwealth a civil penalty of not more than $5,000 per violation, reasonable expenses incurred by the state in investigating and preparing the case, not to exceed $250 per violation, and attorney's fees.  Va. Code Ann. § 57-59(E).

16.     Minnesota, by its Attorney General, is authorized to bring an action to enjoin violations of laws relating to consumer protection or respecting unfair, discriminatory, or other unlawful practices in business, commerce, or trade, including the authority to bring an action to enforce Minnesota's laws relating to charitable organizations, professional fundraisers, and the solicitation of charitable contributions in Minnesota.  Minn. Stat. §§ 8.31, 309.50 to 309.61, and 325D.44.  Pursuant to Minnesota Statutes chapter 8, Minnesota Statutes Sections 309.50 to .61 and 325D.43–.48, and common law authority, including *parens patriae* authority, the Minnesota Attorney General is authorized to seek and the Court is authorized to award any necessary order or judgment including injunctive relief, restitution, civil penalties up to $25,000 for each violation, suspension of registration, other equitable relief, awards of reasonable attorney's fees, and costs of investigation and litigation.

17.     New Jersey's Attorney General is charged with the responsibility of enforcing the NJCFA, the NJCRIA, and the regulations promulgated thereunder, specifically the Regulations Governing Charitable Fundraising.  The Acting Director of the New Jersey Division of Consumer Affairs is charged with the responsibility of administering the NJCFA, the NJCRIA,

and the regulations promulgated thereunder, specifically the Regulations Governing Charitable Fundraising.  Together they are authorized to bring this action for permanent injunctive relief, restitution, disgorgement, penalties, attorney's fees and costs, as well as other equitable relief.

18.     Pursuant to authority found in 15 U.S.C. § 6103(a), Plaintiffs New York, Virginia, Minnesota, and New Jersey are also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

## **DEFENDANTS**

19.     Defendant Outreach Calling, Inc., also doing business as Market Process Group ("Outreach"), is a Nevada corporation with its principal place of business at 200 S. Virginia Street, 8th Floor, Reno, NV 89501.  Until 2019, Outreach also had an office at 150 River Road, Suite 13, Montville, NJ 07045.  Outreach transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Outreach has made misrepresentations in its fundraising campaigns on behalf of sham charities to consumers throughout the United States.

20.     Defendant Outsource 3000, Inc., also doing business as Outreach Calling, Inc. ("Outsource"), is a New Jersey corporation with its principal place of business at 1 International Blvd., Suite 400, Mahwah, NJ 07495.  Outsource, however, does not have any employees at its principal place of business but primarily conducted its operations at 150 River Road, Suite 13, Montville, NJ 07045 and 200 S. Virginia Street, 8th Floor, Reno, NV 89501 where it has shared employees and office space with Outreach and Production Consulting Corp.  From

approximately 1989 to 2005, Outsource operated under the names All-Pro Telemarketing

Associates, Inc., and All-Pro Associates Corp.  Outsource transacts or has transacted business in

this District and throughout the United States.

   21. Defendant Production Consulting Corp., also doing business as Outreach Calling,

Inc. and 7 Consulting Corp. ("Production Consulting"), is a Delaware corporation with its

principal place of business at 1 International Blvd., Suite 400, Mahwah, NJ 07495.  Production

Consulting, however, does not have any employees at its principal place of business but

primarily conducted its operations at 150 River Road, Suite 13, Montville, NJ 07045 and 200 S.

Virginia Street, 8th Floor, Reno, NV 89501 where it has shared office space and employees with

Outreach and Outsource.  Production Consulting transacts or has transacted business in this

District and throughout the United States.

   22. Defendant Mark Gelvan ("Gelvan") is the president and sole owner of Production

Consulting and Outsource, and the controller and indirect owner of Outreach.  At all times

material to this Complaint, acting alone or in concert with others, he has formulated, directed,

controlled, had the authority to control, or participated in the acts and practices of Outreach,

Outsource, and Production Consulting, including reviewing solicitation materials, negotiating

Outreach's contracts with charities and fundraising subcontractors, responding to regulatory and

law enforcement inquiries from government entities, and overseeing all aspects of Outreach's

fundraising operation as set forth in this Complaint.  Gelvan resides in the State of Florida and,

in connection with the matters alleged herein, transacts or has transacted business in this District

and throughout the United States.

23.     Defendant Thomas Berkenbush ("Berkenbush") is a *de facto* officer and employee of Outreach and a previous employee of Outsource. Along with Defendant William English, Berkenbush co-manages client relationships with Outreach's charity clients, including drafting marketing materials and fundraising scripts, overseeing government inquiries and investigations of clients, and managing state regulatory filing documentation on behalf of Outreach and its clients. Berkenbush resides in the State of New Jersey and, in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

24.     Defendant William English ("English") is a *de facto* officer and employee of Outreach and a previous employee of Outsource. Along with Berkenbush, English co-manages client relationships with Outreach's charity clients, including reviewing marketing materials and fundraising scripts, overseeing the Do Not Call lists on behalf of each charity, overseeing Outreach's relationships with various financial institutions, and responding to consumer complaints about each client. English resides in the State of New Jersey, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

25.     Defendant Damian Muziani ("Muziani") is the purported President and owner of Outreach. His responsibilities include signing contracts on behalf of Outreach such as Outreach's contracts with its charity clients, subcontractors, and financial institutions, and signing checks distributed on behalf of Outreach, including payments to Production Consulting and Outsource. He has also reviewed and approved scripts and marketing materials. Muziani

resides in the State of New Jersey, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

26.     Defendants Outreach, Outsource, and Production Consulting (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, employees, and office locations.  Because these Corporate Defendants have operated as a common enterprise, they are partners in concerted wrongdoing and liable for the acts and practices alleged below.  Gelvan has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise and is a partner in the concerted wrongdoing of the common enterprise.

## COMMERCE

27.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

## DEFENDANTS' FUNDRAISING OPERATION

28.     Since at least 2010, Defendants have engaged in a deceptive fundraising scheme using numerous sham charities primarily to enrich themselves.  Throughout this time, Gelvan,

aided by Berkenbush, English, and Muziani (collectively, "Individual Defendants"), has been the primary leader and beneficiary of the Corporate Defendants' actions.

29.     Defendants solicit charitable donations through nationwide telemarketing campaigns, using telemarketers employed by Outreach or its subcontractors.

30.     Once a telemarketer secures a contribution pledge from a prospective donor, Defendants mail the donor written information (a "mailer") that states how the charity will purportedly use the donation and provides instructions on how to submit a donation, typically via check.

31.     An escrow agent or payment processing company distributes the donated funds to Outreach, any subcontractors involved in the fundraising campaign, and the charity client. Outreach then disburses the funds to the other Corporate Defendants and, ultimately, to Gelvan.

32.     Defendants orchestrate all aspects of their charity clients' fundraising activities. They supply the lists of prospective donors ("call lists") used by telemarketers in their fundraising campaigns and draft the scripts their telemarketers use to describe the benefits each charity purportedly provides in seeking donations. Defendants retain ownership of the call lists instead of the charity client. Defendants also draft the mailers that they send to prospective donors reiterating the charitable programs donors are purportedly supporting.

33.     Defendants receive and, in some instances, assist in responding to consumer complaints about their charity clients. Defendants provide Outreach's contact information in their telemarketing scripts and mailers, rather than the contact information of their charity clients. In some instances, Defendants also advise their clients on what content the clients should include on their websites or what popular issues their clients should state they fundraise

to support.  Defendants have also advised their charity clients on the entity name under which their charity clients should solicit donations.

34.     Defendants hire subcontractors that support the fundraising operation, such as telemarketers, a company that provides donor list management and mail fulfillment services, a caging service that collects the mailed donations and deposits them into a charity client's escrow account, and an escrow agent or payment processing company that distributes the funds to Outreach, its subcontractors, and the charity, and provides financial reports on the distributions.

35.     The subcontractors typically enter into contracts with Outreach because Outreach generally has an exclusive telemarketing contract with the charity client.  In some instances, at Gelvan's direction, the subcontractors may enter into contracts directly with the charity.

36.     In instances where a subcontractor telemarketer is used, Defendants direct the subcontractor's telemarketing campaigns by providing the fundraising scripts and mailers, and overseeing any issues between the subcontractor and the charity.  In most instances, Defendants are also paid a percentage of the gross contributions the subcontractor telemarketer raises on behalf of the charity.

37.     Defendants also assist their charity clients with their regulatory obligations. Defendants create and maintain the clients' Do Not Call lists—a list of prospective donors who have asked to be removed from any call lists—that is required by the Telemarketing Sales Rule. Defendants are responsible for ensuring its telemarketers and any subcontractor telemarketers comply with federal regulations, such as the TSR's Do Not Call requirements.  Defendants are also responsible for ensuring its telemarketers and subcontractor telemarketers comply with state regulations in telemarketing for charity donations, such as state laws requiring professional

fundraisers to disclose their names, which must match the names on file with the attorney general when soliciting, and that the solicitation is being conducted by a "professional fundraiser." Defendants also review the forms the charities must file on an annual basis with the Internal Revenue Service ("IRS") and the respective regulator for each State in which the charity engages in fundraising, such as the IRS Form 990, which includes a description of the amount of money the charity spends on its charitable programs.

38.     Defendants are kept informed of regulatory inquiries or actions instigated by state or federal law enforcement agencies, and typically assist in responding to such inquiries.  The charity clients also typically keep Defendants informed of any negative press coverage that the charity clients receive.

39.     Defendants have referred other professional service organizations to their charity clients, such as law firms and accounting firms, to assist their efforts to comply with regulatory obligations.  Defendants have also directed their charity clients to financial institutions they should use in order to receive the proceeds of the fundraising campaigns Defendants conduct on their behalves.

40.     Defendants' compensation for their fundraising services is typically between 85-90% of the amount fundraised.  The remaining 10-15% is distributed to the charity clients.

## DEFENDANTS' SHAM CHARITY CLIENTS

### *National Vietnam Veterans Foundation, Inc.*

41.     From 2010 to September 2016, Defendants provided fundraising services to the National Vietnam Veterans Foundation, Inc. also doing business as American Veterans Support Foundation ("NVVF").  NVVF was formed as a nonprofit corporation in the District of

Columbia in 1992.  Its corporate headquarters was located in Alexandria, Virginia in the personal

residence of its President and Chairman of the Board, John Thomas Burch, Jr.  NVVF's stated

mission was "Veterans helping Veterans with the generous support of the American people."

42.     In their fundraising campaigns, Defendants represented that NVVF provided

"assistance with care packs for hospitalized veterans as well as food programs for homeless

veterans."  In the mailers, Defendants represented that NVVF provided: (1) "Personal care packs

and free long distance telephone cards so hospitalized veterans can call and hear the voice of a

loved one;" (2) "televisions and personal care packs for patients in VA hospitals;" (3) "funding

to veteran Food Pantry Programs for unemployed and homeless veterans and their families;" and

(4) "financial grants to Operation Stand-Downs which benefit homeless or unemployed

veterans."

43.     These representations were false and misleading.  In truth and fact, from 2012 to

2014 NVVF raised over $20 million from all of its professional fundraisers and spent less than

1.5% of the funds raised on its charitable programs.  For example, in 2014 NVVF reported in its

IRS Form 990 that it raised $8,657,816 but only provided $122,333 in purported "contributions

to various veterans organizations, charities and educational programs."  Of that amount, NVVF

purportedly provided 35 grants for necessities to veterans or families of veterans, amounting to

$35,104 in total.  One of the veteran organizations that received a grant from NVVF in 2012 was

Center for American Homeless Veterans, Inc., another one of Defendants' sham charity clients.

44.     NVVF paid the majority of the funds raised to its professional fundraisers.  Based

on NVVF's contract with Outreach, Outreach retained 89% of the funds it raised, giving NVVF

only 11%.  From 2010 through 2016, Defendants raised over $28 million on NVVF's behalf and retained over $25 million.

45.     NVVF also paid an additional 4% of its gross collected donations to Mail Response Services, Inc. ("MRS"), a company Defendants selected to provide escrow and payment processing services to all of Defendants' charity clients.  Between the fees collected by Defendants and by MRS, NVVF received approximately 7% of the gross collected donations.

46.     Of the small percentage of the funds that NVVF retained, the bulk was spent on funding its President's, John Burch's, lavish lifestyle.  Such expenditures included weekly expenses at nightclubs in Baltimore, expensive food and drink at the country's top restaurants, foreign and domestic travel, parking for two automobiles in downtown Washington, D.C. where he worked full-time at another job, and paying for his medical expenses, his life and medical insurance policies, and the utilities for his home.

47.     Burch was also in charge of NVVF's "Emergency Assistance Program," a discretionary fund meant to assist veteran family members with small children in chronic destitute circumstances by providing grants ranging from $100 to $250.  Instead of helping veterans in need, Burch distributed these funds to relatives, friends, and acquaintances while denying or providing limited funds to legitimate claimants.  From 2010 to 2015, Burch distributed the majority of these funds to a handful of women unrelated to any veterans, seven of whom received over $10,000.

48.     In or around 2016, New York initiated an investigation into Defendants' deceptive fundraising practices on behalf of NVVF.  Defendants were aware of this investigation.

49.     In November 2016, NVVF and Burch entered into Assurances of Discontinuance with New York requiring NVVF to dissolve and permanently barring Burch from serving as an officer, director, trustee, or fiduciary of any charitable organization.  Burch was also required to pay $100,000 in penalties.

50.     In June 2017, Burch pled guilty in the U.S. District Court for the District of Columbia to wire fraud for embezzling at least $149,317 from NVVF and spending it on non-business related travel, clubs, restaurants, hotels, and women engaged in personal relationships with Burch.   He was sentenced to 5 months in prison in October 2017, followed by 5 months home detention.  He was also ordered to pay $75,000 in a forfeiture money judgment.

51.     NVVF had been in business with the Individual Defendants since at least 2008 when NVVF's professional fundraiser was Community Support, Inc. ("CSI"), a company the Individual Defendants operated prior to Outreach.  *See* Par. (100).

### *Breast Cancer Survivors Foundation*

52.     From 2010 to 2017, Defendants provided fundraising services to Breast Cancer Survivors Foundation, Inc. also doing business as Women's Breast Cancer Relief Association ("BCSF").  BCSF was incorporated in 2010 as a charitable corporation in Delaware and was formed, at Gelvan's suggestion, by Dr. Yulius Poplyansky.  Dr. Poplyansky originally approached Gelvan, a long-time family friend, for assistance in raising money to provide prosthetics and treatment to Israelis injured by explosive devices.  Gelvan convinced Dr. Poplyansky to change course entirely and focus on breast cancer because it is a popular fundraising cause.  BCSF's stated mission was "to educate the public about breast cancer and the

importance of early detection and self-examination" and to "provide a forum for breast cancer survivors to convene and discuss issues related to breast cancer."

53.     In their fundraising campaign, Defendants represented that BCSF "helps to provide mammograms, medical services and life saving tests for women who cannot afford it." In their mailers, Defendants represented that BCSF "provides a forum for breast cancer survivors to convene and to be able to discuss issues related to breast cancer," and that BCSF "looks forward to participating in an international pharmaceutical program striving to help save lives of women everywhere from this deadly disease." The mailer also appeared in the guise of a heartfelt letter from Dr. Poplyansky who described how he was "personally devastated when [he] lost several patients to Breast Cancer," and stated "[b]y the time they came to our facility they were in stage four and it was already too late."

54.     These representations were false and misleading. BCSF never provided a forum for breast cancer survivors, it never had a medical facility to provide treatments nor did Dr. Poplyansky have any medical expertise in treating breast cancer or even oncology as implied by the scripts and the mailers, and BCSF never intended to provide international aid. BCSF also did not provide direct services or program services as implied in the scripts and mailers, but instead provided limited monetary grants to clinics that then provided services and mammograms.

55.     Defendants received the vast majority of the funds raised. Based on BCSF's contract with Outreach, Defendants retained approximately 90% of the funds raised, leaving 10% of the funds for BCSF. Of the remaining funds, BCSF spent little on the charitable services that Defendants described in the scripts and mailers. For example, in 2010 BCSF reported in its IRS Form 990 that Defendants raised $531,041 on BCSF's behalf and retained $478,918. Of BCSF's

remaining portion of $52,123, BCSF provided no charitable services or funds.  From 2010 to

2016, BCSF raised over $24 million through all of its professional fundraisers and spent less than

2% of the funds raised in grants to verifiable medical clinics.   In that same time period,

Defendants raised over $18 million on BCSF's behalf and retained over $16 million.

56.     BCSF also paid an additional 2% of its gross collected donations to MRS.

Between the fees collected by Defendants and by MRS, BCSF received approximately 8% of the

gross collected donations.

57.     From BCSF's inception, Dr. Poplyansky delegated his authority to control the

organization to Gelvan.  Gelvan was actively involved in BCSF's internal operations including:

(1) overseeing BCSF's outside accounting matters, such as hiring McEnerney Brady & Co., LLC

("McEnerney") to function as BCSF's outside auditor and overseeing its work; (2) retaining and

managing all of BCSF's fundraisers; (3) organizing and attending BCSF's board meetings and

preparing BCSF's board minutes; (4) securing BCSF's virtual office space in Florida; (5)

coordinating a response to media attacks against BCSF's reputation; (6) managing and approving

the content and design of BCSF's website; (7) managing the application and process of selecting

grant recipients for BCSF's funding; and (8) assisting in preparing BCSF's responses to

regulatory inquires.  Gelvan advised BCSF to use the name "Women's Breast Cancer Relief

Association" to fundraise for donations.  Gelvan also referred Dr. Poplyansky to the law firm

Copilevitz & Canter, LLC, now known as Copilevitz, Lam & Raney, P.C. ("Copilevitz &

Canter"), with whom Gelvan has had a long-standing professional relationship, for assistance in

preparing BCSF's formation documents and annual regulatory filings that BCSF submitted to

state and federal regulators.  Dr. Poplyansky relied on Gelvan and on the advice of Copilevitz &

Canter in making decisions regarding BCSF's operations.

58.     In or around 2014, New York initiated an investigation of Defendants' deceptive

fundraising practices on behalf of BCSF.  Defendants were aware of the investigation and

Gelvan actively assisted BCSF in preparing its responses to New York's inquiries.

59.     In May 2017, BCSF and Dr. Poplyansky entered into an Assurance of

Discontinuance with New York requiring BCSF to dissolve and permanently barring Dr.

Poplyansky from serving as an officer, director, trustee, or fiduciary of any charitable

organization.

### *Reserve Police Officers Association*

60.     From 2010-2018, Defendants provided fundraising services to Reserve Police

Officers Association also doing business as Association for Deputy Sheriffs ("RPOA").  RPOA

was originally formed in 1996 as a Delaware nonprofit under the name National Reserve Peace

Officers Association.  Michael B. Webster was the President of RPOA, and had been with the

nonprofit since approximately 2001.  RPOA's stated mission was to "provide assistance to law

enforcement officers and their families."

61.      In their fundraising campaigns, Defendants represented that RPOA provides "life

saving equipment such as bullet proof vests for volunteer, reserve, & auxiliary police officers,"

and it "assists families of member officers who become disabled or killed in the line of duty."

62.     These representations were false and misleading.  RPOA provided very little

assistance to families of officers disabled or killed in the line of duty.  RPOA made only one

donation in 2012 and another in 2013.  In fact, from 2011 to 2017, RPOA spent a total amount of

$2,300 on assistance to families of fallen or disabled officers, which amounts to approximately 0.06% of the gross contributions collected in those same years.

63.     RPOA also spent a *de minimis* amount on "life saving equipment" for sheriffs and police departments.  For example, in 2014 RPOA spent less than 2.2% of the gross contributions on life saving equipment and less than 2% in 2011-2013.  From 2010-2016, RPOA reported in its IRS Form 990s that it raised approximately $4,807,286 through all of its professional fundraisers, and spent less than 5% of that amount on its purported charitable programs.

64.     RPOA paid the vast majority of the funds collected through its fundraising campaigns to Defendants.  Based on RPOA's contract with Outreach, Defendants retained 90% of the funds raised and provided approximately 10% to RPOA.  From 2010-2017, Defendants raised over $3.9 million on RPOA's behalf and retained over $3.4 million for their fundraising services.

65.     RPOA also paid an additional fee of up to 5% of its gross collected donations to MRS.  Between the fees collected by Defendants and by MRS, RPOA received on average 9% of the gross collected donations.

66.     RPOA had been in business with the Individual Defendants since at least 2005 when RPOA's professional fundraiser was CSI.  RPOA's primary contact at CSI and later at Outreach was Berkenbush.  Gelvan advised RPOA to use the name Police Reserve Officers Association to fundraise for donations.

67.     In or around 2017, New York initiated an investigation of Defendants' deceptive fundraising practices on behalf of RPOA.

68.     In April 2018, RPOA and Michael Webster entered into Assurances of Discontinuance with New York requiring RPOA to cease operating in and soliciting contributions within New York State and permanently barring Michael Webster from serving as an officer, director, trustee, or fiduciary of any charitable organization or soliciting contributions in New York State.  RPOA was also required to pay $15,000 in penalties.

### Disabled Police and Sheriffs Foundation

69.     From 2010 to 2018, Defendants provided fundraising services to Disabled Police and Sheriffs Foundation, Inc. also doing business as the American Police and Sheriffs Association and Police Officers Safety ("DPSF").  DPSF was incorporated as a nonprofit in Rhode Island and its headquarters was located in Ste. Genevieve, Missouri.   David Kenik was the Executive Director and sole employee of DPSF.  DPSF's stated mission was to "provide assistance to law enforcement officers nationwide by providing life-saving training" and "financial assistance for families of officers killed in the line of duty."

70.      In their fundraising campaigns, Defendants represented in their fundraising scripts and mailers that DPSF provides "assistance to the families of officers killed in the line of duty,"  "specialized training for police officers to reduce on-the-job injuries and deaths," "assist[ance] [to] officers that have been injured, disabled, or paralyzed," and "life saving equipment for under funded departments."

71.     These representations were false and misleading.  DPSF spent a minimal amount on assisting disabled officers.  For example, from 2013 through 2016, DPSF spent a total of $62,500 on grants to 27 disabled officers, amounting to approximately 0.83% of the gross contributions raised in those same years.  DPSF also spent a minimal amount assisting families

of fallen officers or providing life-saving equipment.  In 2015, DPSF provided $6,000 in "survivor assist grants" to 3 families and $7,251 for equipment grants to 3 law enforcement departments, amounting to less than 0.1% of the total gross contributions received that year.

72.     From 2010 to 2016, DPSF raised approximately $10,620,099 through its professional fundraisers.  DPSF spent less than 2% of its gross contributions in providing grants to disabled officers or family members of fallen officers and grants for life-saving equipment, and less than 5% on any charitable programs in general.

73.     DPSF paid the vast majority of the funds collected through Defendants' fundraising campaigns to Defendants.  Based on DPSF's contract with Outreach, Defendants retained 90% of the funds raised and provided approximately 10% to DPSF.  From 2010-2017, Defendants raised over $10 million on DPSF's behalf and retained over $9 million for their fundraising services.  The remaining money DPSF received from its professional fundraisers primarily funded Mr. Kenik's six-figure salary.

74.     DPSF maintained a long-standing relationship with the Individual Defendants. Their business relationship began in or around 2002 when DPSF contracted with Outsource, doing business at the time as All-Pro Telemarketing Associates, for professional fundraising services.  It continued throughout the various corporate structures the Individual Defendants have used to operate their fundraising business.  Since the beginning of their business relationship, DPSF has consistently interacted with Berkenbush, English, and Gelvan on its fundraising campaigns.

75.     DPSF also accepted Gelvan's recommendations for legal counsel and audit firms. In or around 2002, DPSF retained Copilevitz & Canter as its legal counsel and hired McEnerney as its audit firm.

76.     DPSF kept Gelvan informed of any regulator inquiries or concerns about DPSF's fundraising activities, and Gelvan typically advised DPSF in responding to those inquiries and concerns.  For example, in or around 2018, after receiving an inquiry from New York, DPSF agreed to stop soliciting in New York based on Gelvan's advice.  DPSF also kept Gelvan informed of any negative media coverage and, in some instances, complaints from consumers on issues such as Defendants' failure to add the consumer's name to Defendants' Do Not Call List for DPSF despite repeated requests to do so.

77.     In March 2019, DPSF and Mr. Kenik entered into a Stipulated Order for Permanent Injunction and Monetary Judgment with the FTC and the Attorney General of Missouri.  The order permanently bars DPSF and Mr. Kenik from charitable fundraising. Defendants were aware of the FTC and State of Missouri's investigation of DPSF's deceptive practices by the end of 2017 or the beginning of 2018.

### Center for American Homeless Veterans

78.     From 2011 to 2018, Defendants provided fundraising services to two related entities called Center for American Homeless Veterans, Inc., also doing business as Association for Homeless and Disabled Veterans and American Veterans Association, and Circle of Friends for American Veterans, also doing business as American Homeless Veterans and Homeless Veterans of America (collectively, "CAHV").  Both entities were incorporated as nonprofit organizations in Virginia and were operated as a common enterprise by their President, Brian

Hampton.  The entities shared common ownership and office space in Northern Virginia, and had overlapping employees, managers, officers, and finances.  CAHV's stated mission was to "benefit American homeless veterans" and "educate the public about the challenges facing unemployed, under-educated, and homeless veterans."

79.     In their fundraising campaigns, Defendants represented that CAHV "supports programs that provide assistance for our homeless & disabled veteran war heroes" and "programs that help get veterans off the streets and into productive lives."  Defendants' mailers reiterated these representations by stating the "veterans assistance facilities that [CAHV's] advocacy supports, boasts job success rates of over 50%!" and they "successfully get one out of every two recipients off the streets, for good!"  The mailers also stated "[p]articipants in the veterans assistance programs [CAHV] support[s] must remain drug and alcohol-free, must maintain a clean-cut appearance, must be responsible for daily chores and be willing to work if able to stay in the program."

80.     These representations were false and misleading.  They implied that CAHV provided direct services or, at minimum, funding to organizations with direct services to assist disabled and homeless veterans.  In fact, CAHV provided virtually no direct services or funding to any such organizations.  From 2011 to 2016, CAHV described its programmatic expenditures in its IRS Form 990s to include media campaigns, creating educational materials, and lobbying 200 members of Congress on veteran issues.  CAHV has not engaged in any significant work on behalf of or supporting any transitional facilities for homeless veterans in over a decade.

81.     The vast majority of the funds raised went to CAHV's professional fundraisers. Based on CAHV's contract with Outreach, Defendants retained approximately 90% of the funds

raised, leaving 10% to CAHV.  From 2010 through 2017, CAHV's gross contributions from all professional fundraisers amounted to over $26 million.  In that same time period, Defendants raised over $16 million on CAHV's behalf and retained over $14 million of those funds.

82.     Of the 10% that CAHV received, most of the funds went to pay Mr. Hampton's six-figure annual salary and to pay for purported administrative expenses.  From 2010 through 2016, CAHV's IRS Form 990s reported that CAHV paid Mr. Hampton over $1.3 million.

83.     In March 2020, CAHV and Mr. Hampton entered into an Assurance of Discontinuance with New York and a Consent Judgment with Virginia that bar CAHV and Mr. Hampton from charitable fundraising and require them to pay $100,000.  Defendants were aware of New York and Virginia's investigation of CAHV's deceptive practices by December 2017.

*Crisis Relief Network*

84.     Since 2013, Defendants have provided fundraising services to Crisis Relief Network, Inc. also doing business as Breast Cancer Relief Network, Children's Cancer Relief Foundation, Disabled Children's Relief Foundation, and Veteran's Trauma Support Network and formerly known as Child Watch of North America, Inc. also doing business as The Childhood Abuse and Trauma Foundation ("CRN").  CRN was incorporated as a nonprofit organization in Florida in 1993 by founder Donald Wood.  At the time of its creation, CRN's mission was to prevent child abduction and assist abducted children.  Since then, at Gelvan's behest, its mission has radically expanded to providing therapy to individuals who have suffered trauma from a variety of sources that are popular fundraising topics, including survivors of childhood abuse, children with cancer, and breast cancer patients.

85.     From approximately 2013 to 2014, Defendants represented in their fundraising campaigns that CRN "helps children who have been exposed to violence and trauma." Defendants also represented in their mailers that CRN's "therapy solution can help with the serious consequences of children's exposure to violence and trauma."

86.     In or around 2014, at Gelvan's suggestion, CRN expanded its therapy services to include disabled children and children suffering from cancer.  Defendants represented in their fundraising campaigns that CRN "provides much needed therapy support for disabled children as well as the families of these special children struggling with every day life" and CRN "provides specialized therapy and support for children with cancer and children with life threatening illness."

87.     Gelvan also suggested that CRN expand its services to provide therapy to breast cancer patients in or around 2017.  Defendants represented in their subsequent fundraising campaigns that CRN "provides specialized therapy and support for women living with breast cancer to help improve their quality of life while they are battling this deadly disease."

88.     All of these representations are false and misleading.  From 2013 to 2017, CRN raised over $7 million through its professional fundraisers, but in 2015 and 2016 spent approximately $84,000 per year on therapy services, amounting to less than 1.2% of the funds raised.  CRN has had only one therapist on staff able to provide trauma therapy, and from 2011 to 2017, CRN provided therapy treatments to approximately 50-100 patients each year.  Since 2017, CRN has only provided therapy services to approximately 20 breast cancer patients.

89.     CRN has spent the bulk of its purported charitable program expenditures on an "Awareness Campaign" to generate interest in the trauma therapy services CRN provides.  For

example, in 2014, CRN raised approximately $999,644 through fundraising and spent approximately $506,902 on its "Awareness Campaign."

90.     Based on CRN's contract with Outreach, Defendants have retained approximately 90% of the funds they raised and distributed 10% to CRN.  In or around June 2015, Defendants became CRN's exclusive professional fundraiser, and from 2015 to 2017, CRN paid Defendants over $2 million for their fundraising services.

91.     CRN has primarily interacted with Gelvan, Berkenbush, and English in its business relationship with Outreach.  For issues related to consumer complaints or inquiries, such as consumer requests to be added to Defendants' Do Not Call List for CRN, CRN has informed English or Berkenbush.  For administrative issues such as providing signatures on contracts, or receiving mockups of solicitations materials, CRN has communicated with Berkenbush.

92.     CRN interacted with Gelvan primarily on business issues such as changes in the fundraising campaigns and onboarding new subcontractors.  For example, Gelvan suggested that CRN expand its therapy services to include children with cancer and disabled children.  *See* Par. (86).  CRN made this change, in part, because Gelvan explained that he had previous experience fundraising for similar causes and Defendants already had an appropriate donor base to create call lists.  As CRN expanded its services, it also changed its name from Child Watch to Crisis Relief Network to reflect its purported expanded mission.

93.     This expansion in fundraising scope, however, did not result in increased contributions causing Defendants to consider terminating their relationship with CRN.  To salvage the relationship, in 2017, when BCSF was in the process of dissolving its operations,

Gelvan suggested that CRN expand its services to include breast cancer patients and to use the name Breast Cancer Relief Network to fundraise for donations. *See* Par. (87). After CRN agreed, Gelvan repackaged the solicitation materials Defendants previously used in BCSF's fundraising campaign for use in CRN's fundraising campaign. Gelvan did not inform CRN that BCSF was required to dissolve its operations due to its deceptive fundraising practices.

94.     In or around 2018, Minnesota initiated an investigation of CRN and Defendants' deceptive fundraising practices. Defendants are aware of this investigation.

## PRIOR STATE ENFORCEMENT ACTIONS

95.     Individual Defendants Gelvan and Berkenbush have been in the professional fundraising business together for nearly 30 years since approximately 1990, and with English and Muziani for nearly 20 years since approximately 2001. Gelvan began his first professional fundraising company, All-Pro Telemarketing Associates, Inc. ("All-Pro Telemarketing"), in or around 1989. Although Gelvan formed All-Pro Telemarketing in partnership with others, he became the sole shareholder by 1990. Berkenbush, English, and Muziani were all employees of All-Pro Telemarketing. Berkenbush joined All-Pro Telemarketing in or around 1990, and English and Muziani joined in or around 2001. All-Pro Telemarketing provided similar fundraising services to its charity clients as Outreach.

96.     In or around 1996, New York initiated an investigation of All-Pro Telemarketing and Gelvan for their fundraising campaigns on behalf of the Fraternal Order of New York State Troopers. In its investigation, New York determined that All-Pro Telemarketing called New York residents, pretending to be New York State Troopers in some instances, and falsely represented that the donations collected would be used for anti-drug and alcohol presentations in

elementary schools Statewide.  They also falsely represented that the funds would be used for an emergency fund to benefit charitable organizations, widows and orphans of the Order's members, and State Troopers.

97.    All-Pro Telemarketing and Gelvan resolved the investigation in or around 1996 by entering into an agreement to pay a $30,000 penalty and agreeing to use a pre-approved script for telephone solicitations.

98.    In 2002, New York filed a complaint against All-Pro Telemarketing and Gelvan for violating the terms of the 1996 agreement and continuing their deceptive fundraising practices on behalf of the Fraternal Order of New York State Troopers from 1995 to 2001.  In January 2004, All-Pro Telemarketing and Gelvan entered a Stipulation and Order of Settlement ("2004 Stipulation and Order") that barred All-Pro Telemarketing and Gelvan from charitable fundraising in the State of New York.

99.    In or around 2004, All-Pro Telemarketing amended its name to All-Pro Associates Corp.  It amended its name again in 2005 to Outsource 3000, Inc.  Gelvan made this change because of the negative press associated with the All-Pro Telemarketing brand.

100.    In or around 2004, Defendants also changed their business structure to obfuscate Gelvan's role in, and control over, the fundraising scheme.  In 2003, Defendants formed a new company, CSI, to function as the new fundraiser.  Berkenbush was the purported President of CSI and Gelvan's father-in-law, Gersh Goldiner, was an officer of CSI.  At Gelvan's direction, Goldiner became an officer of CSI to help Gelvan protect his interests in the fundraising operation and retain control over CSI.  Under the new business model, Gelvan claimed he provided "consulting" services to CSI first through All-Pro Telemarketing and then through

Outsource.  His consulting services included identifying charity clients for CSI, negotiating contracts on CSI's behalf with the charity clients, reviewing solicitation materials, and identifying subcontractors CSI would use and negotiating contractual terms on CSI's behalf.

101.    In providing his purported "consulting" services through All-Pro Telemarketing and Outsource, Gelvan was acting as a Fundraising Counsel, as the term is defined under N.Y. Exec. Law § 171-a(9) and N.J.S.A. 45:17A-20.

102.    In or around May 2009, as part of "Operation False Charity"—a nationwide, federal-state crackdown on fraudulent telemarketers claiming to help police, firefighters, and veterans—approximately 30 State Attorneys General filed consent decrees with CSI.  The consent decrees barred CSI from misrepresenting as to any charity client "the nature or purpose of the charitable program activities," what "portion of the donation [] will be retained by the charity," and "that the charity has any connection to or is affiliated with an organization or agency, including a police, fire or other public safety organization."

103.    Defendants formed Outreach in or around September 2009 and listed Muziani as the President and owner.  Berkenbush and English became *de facto* officers of Outreach, and Gelvan continued to provide "consulting" services to Outreach through Outsource.  Gelvan receives any profits Outreach earns while Muziani receives a salary that is determined based on Muziani's negotiations with Gelvan.

104.    Gelvan retains control over Outreach, including through Georgia Holding Inc., an entity Gelvan formed as its sole owner in 2009.  Through Georgia Holding, Inc., Gelvan holds the option to purchase all shares of Outreach from Muziani for $1,000.  Muziani is the sole shareholder of Outreach.

105.    Gelvan has also provided "brokering" services to connect subcontractors with charity clients.  For example, in 2010 Gelvan brokered a fundraising agreement between Midwest Publishing-DN, Inc. ("Midwest") and the nonprofit Woman to Woman Breast Cancer Foundation ("W2W"), pursuant to which Midwest solicited charitable contributions in New York on W2W's behalf.  In return for his brokering services, Gelvan received 3% of the funds Midwest raised in New York on W2W's behalf.  Gelvan entered into a similar arrangement on NVVF's behalf in 2010.

106.    Gelvan's brokering activities violated the 2004 Stipulation and Order that he entered into with New York.  In 2014, Gelvan entered into an Assurance of Discontinuance with New York in which Gelvan agreed to pay $50,000 "as disgorgement for the gains in violation of the [2004 Stipulation and Order]."  At Gelvan's direction, Outreach paid the $50,000 penalty on his behalf.

107.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## DEFENDANTS' VIOLATIONS OF FEDERAL AND STATE LAWS

108.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

109.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

110.    N.Y. Exec. Law Section 63(12) prohibits any person from engaging in repeated fraudulent acts or otherwise demonstrating persistent fraud in the conduct of business.  The word

"fraud" or "fraudulent" in Executive Law Section 63(12) includes "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."  N.Y. Exec. Law Section 172-d(2), governing the solicitation of charitable donations, provides that no person shall "[e]ngage in any fraudulent or illegal act, device, scheme, artifice to defraud or for obtaining money or property by means of a false pretense, representation or promise, transaction or enterprise in connection with any solicitation."  To establish fraud under Executive Law Section 172-d(2), neither intent to defraud nor injury need to be shown.  Executive Law Section 172-d(3) prohibits the use of or the intent to use "false or materially misleading advertising or promotional material in connection with any solicitation."  N.Y. Bus. Gen. Law Section 349 bars the use of "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

111.    Pursuant to Virginia Code § 57-57(L), "[n]o person shall employ in any solicitation or collection of contributions for a charitable purpose any device, scheme or artifice to defraud or obtain money or property by any misrepresentation or misleading statement."

112.    Minnesota Statutes Section 325D.44, subdivision 1, prohibits conduct in the course of business that "creates a likelihood of confusion or of misunderstanding."  Minnesota Statutes Section 309.55, subdivision 5, prohibits charitable organizations and persons acting on their behalf from "us[ing] or employ[ing] any fraud, false pretense, false promise, misrepresentation, misleading statement, misleading name, mark or identification, or deceptive practice, method or device, with the intent that others should rely thereon in connection with any charitable solicitation[.]"  Misrepresentations or deceptive omissions of fact constitute deceptive

acts or practices prohibited by Minnesota Statutes Sections 325D.44, subdivision 1, and 309.55, subdivision 5.

113.    Minnesota Statutes Section 309.556, subdivision 2, provides that "any professional fund-raiser soliciting contributions in this state shall also disclose the name of the professional fund-raiser as on file with the attorney general and that the solicitation is being conducted by a 'professional fund-raiser.'"  A professional fundraiser that fails to clearly disclose its name, which must match the name on file with the Minnesota Attorney General's Office, or that the solicitation is being conducted by a "professional fundraiser" prior to orally requesting a contribution has violated Minnesota Statutes Section 309.556, subdivision 2.

114.    Under the New Jersey CFA, the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby is a violation of the NJCFA, specifically N.J.S.A. 56:8-2, and the NJCRIA, N.J.S.A. 45:17A-32.

**Count I**

**Deceptive Fundraising in Violation of the FTC Act and State Laws**

(As to All Defendants by All Plaintiffs)

115.    In numerous instances in connection with fundraising on behalf of sham charities, Defendants have represented, directly or indirectly, expressly or by implication, the following representations:

a)    Defendants' representations for NVVF:

   i)    NVVF provided personal care packs, televisions, and long distance telephone cards to hospitalized veterans;

   ii)    NVVF provided assistance to food programs for homeless veterans; and

   iii)    NVVF provided financial grants to Operation Stand-Downs to benefit homeless or unemployed veterans.

b)    Defendants' representations for BCSF:

   i)    BCSF provided mammograms and medical services to women;

   ii)    BCSF provided a forum for breast cancer survivors to convene; and

   iii)    BCSF intended to participate in an international pharmaceutical program for breast cancer patients.

c)    Defendants' representations for RPOA:

   i)    RPOA provided life-saving equipment to law enforcement officers; and

        ii)      RPOA assisted families of fallen or disabled member officers.

  d)      Defendants' representations for DPSF:

        i)      DPSF provided assistance to families of fallen officers;

        ii)      DPSF provided assistance to disabled officers;

        iii)      DPSF provided life-saving equipment to law enforcement departments or grants to purchase such equipment; and

        iv)      DPSF provided advanced training programs for law enforcement departments and officers.

  e)      Defendants' representations for CAHV:

        i)      CAHV supported programs that provide assistance to homeless or disabled veterans; and

        ii)      CAHV provided assistance to transitional facilities for homeless veterans.

  f)      Defendants' representations for CRN:

        i)      CRN provides therapy to children who have experienced trauma, children with cancer, disabled children, and breast cancer patients.

116.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 115, Defendants' sham charity clients spent little or none of the donors' contributions on the specified programs.

117.    Therefore, Defendants' representations as set forth in Paragraph 115 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

118.    The foregoing practices also violate N.Y. Exec. Law Article 7-A and § 63(12) and

N.Y. Gen. Bus. Law § 349; Virginia Code Ann. §§ 57-57(L); Minnesota Statutes Sections

309.55, subdivision 5, and 325D.44, subdivision 1; and N.J.S.A. 56:8-2 and N.J.S.A. 45:17A-32.

## DEFENDANTS' VIOLATIONS OF STATE LAWS

### Count II

### Failure to Register as Fund Raising Counsel in Violation of N.Y. Exec. Law
### §§ 171-a(9), 172-d(12), 173, 173-a

(As to Defendants Outsource 3000 & Gelvan by Plaintiff New York)

119.    N.Y. Exec. Law § 171-a(9) defines fund raising counsel as "[a]ny person who for

compensation consults with a charitable organization or who plans, manages, advises, or assists

with respect to the solicitation in [New York State] of contributions for or on behalf of a

charitable organization . . . ."

120.    At all times relevant to this Complaint, Gelvan and his company, Outsource 3000,

have consulted with charitable organizations soliciting donations in New York State, and have

planned, managed, advised, and assisted those charitable organizations in the solicitation of

contributions from the residents of New York State for those organizations.

121.    Gelvan and Outsource 3000's consulting services have included, among other

things, drafting and editing telemarketing scripts and solicitation letters that contained

misrepresentations; advising charities on the fabrication of alternative names; and introducing

charities to telemarketing companies that were permitted to solicit in New York State since

Outreach has not been permitted to do so, and providing those telemarketing companies the

scripts and solicitation letters for use in New York State.

122.    At all times relevant to this Complaint, Gelvan and Outsource 3000 have failed to register as fund raising counsel with the New York State Office of the Attorney General (the "NYS OAG"), in violation of N.Y. Exec. Law §§ 172-d(12), 173(1).  They have also failed to enter into and file with the NYS OAG written contracts with the charitable organizations benefitting from their services, in violation of N.Y. Exec. Law § 173-a(1).

**Count III**

**Scheme to Defraud in Violation of N.Y. Exec. Law §§ 172-d(2), 175(2)(a) and (c)**

(As to All Defendants by Plaintiff New York)

123.    In numerous instances, Defendants have engaged in a fraudulent scheme in connection with charitable solicitations by: (a) providing charities soliciting contributions in New York State with false and misleading solicitation materials, including telemarketing scripts and solicitation letters; (b) failing to describe the charities' programs and activities accurately in the solicitation materials; (c) falsely representing to donors the intended use of their contributions; (d) using false and misleading promotional materials; and (e) failing to apply contributions in a manner substantially consistent with the solicitations being made or with the charities' stated charitable purposes, as expressed in each charity's Certificate of Incorporation.

124.    Therefore, Defendants' acts or practices as set forth in Paragraph 123 violate N.Y. Exec. Law §§ 172-d(2) and 175(2)(a) and (c).

**Count IV**

**Misrepresentations in Violation of N.Y. Exec. Law §§ 172-d(3), 175(2)(g)**

(As to All Defendants by Plaintiff New York)

125. Defendants have used or have intended to use false and materially misleading advertising and promotional materials in connection with solicitations by drafting, and advising charitable organizations soliciting in New York State to use, telemarketing scripts and solicitation letters that contained false statements and misrepresentations about the charities' programs and activities.

126. Therefore, Defendants' acts or practices as set forth in Paragraph 125 violate N.Y. Exec. Law §§ 172-d(3) and 175(2)(g).

**Count V**

**Deceptive Acts and Unlawful Practices in the Conduct of Business in Violation of N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law § 349**

(As to All Defendants by Plaintiff New York)

127. Defendants have engaged in persistent fraud and illegality in the conduct and transaction of business by, for compensation: (a) providing charities soliciting contributions in New York State with false and misleading solicitation materials, including telemarketing scripts and solicitation letters; (b) failing to describe the charities' programs and activities accurately in the solicitation materials; (c) falsely representing to donors the intended use of their contributions; (d) failing to apply contributions in a manner substantially consistent with the solicitations being made or with the charities' stated charitable purposes, as expressed in each charity's Certificate of Incorporation; and (e) failing to register entities in New York in order to

conceal Gelvan's participation in the fraudulent scheme so that Defendants could continue to

earn money through charitable solicitations in New York despite the 2004 Stipulation and Order.

128.    Therefore, Defendants' acts or practices as set forth in Paragraph 127 violate N.Y.

Exec. Law § 63(12) and N.Y. Gen. Bus. Law § 349.

## Count VI

### Failure to Provide Required Disclosures in Violation of State Law

#### (As to All Defendants by Plaintiff Minnesota)

129.    In numerous instances, Defendants have, when soliciting Minnesota residents

over the telephone for a charitable contribution, failed to clearly disclose the name of the

professional fundraiser as on file with the Attorney General and/or failed to clearly disclose that

the solicitation was being conducted by a "professional fundraiser."

130.    Therefore, Defendants' acts or practices as set forth in Paragraph 129 constitute

multiple, separate violations of Minnesota Statutes Section 309.556.

## <u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>

131.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and

deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–

6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended

certain sections thereafter.

132.    The Telemarketing Act also authorizes Attorneys General to initiate federal

district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such

case, to obtain damages, restitution, and other compensation on behalf of their residents.  15

U.S.C. § 6103(a).

133. The TSR defines "telemarketer" to mean "any person who, in connection with telemarketing, initiates or receives telephone calls from a customer or donor." 16 C.F.R. §310.2(ff).

134. The TSR defines "telemarketing" to mean, in pertinent part, "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

135. Defendants are telemarketers engaged in telemarketing as defined by the TSR, 16 C.F.R. § 310.2(ff), and (gg).

136. The TSR prohibits telemarketers from making a false or misleading statement to induce a charitable contribution. 16 C.F.R. § 310.3(a)(4). The TSR also prohibits telemarketers from misrepresenting, directly or by implication, the nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested, and the purpose for which any charitable contribution will be used. 16 C.F.R. § 310.3(d)(1) and (3).

137. The TSR also prohibits telemarketers from initiating outbound calls to a person when that person has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the charitable organization for which a charitable contribution is being solicited. 16 C.F.R. § 310.4(b)(1)(iii)(A).

138. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count VII**

**Deceptive Telemarketing Calls in Violation of the TSR**

(As to All Defendants by All Plaintiffs)

139.    In numerous instances, in connection with fundraising on behalf of sham charities, Defendants have misrepresented, directly or indirectly, expressly or by implication, the following representations:

a)    Defendants' representations for NVVF:

i)    NVVF provided personal care packs, televisions, and long distance telephone cards to hospitalized veterans;

ii)    NVVF provided assistance to food programs for homeless veterans; and

iii)    NVVF provided financial grants to Operation Stand-Downs to benefit homeless or unemployed veterans.

b)    Defendants' representations for BCSF:

i)    BCSF provided mammograms and medical services to women;

ii)    BCSF provided a forum for breast cancer survivors to convene; and

iii)    BCSF intended to participate in an international pharmaceutical program for breast cancer patients.

c)    Defendants' representations for RPOA:

i)    RPOA provided life-saving equipment to law enforcement officers; and

        ii)      RPOA assisted families of fallen or disabled member officers.

    d)      Defendants' representations for DPSF:

        i)      DPSF provided assistance to families of fallen officers;

        ii)      DPSF provided assistance to disabled officers;

        iii)      DPSF provided life-saving equipment to law enforcement departments or grants to purchase such equipment; and

        iv)      DPSF provided advanced training programs for law enforcement departments and officers.

    e)      Defendants' representations for CAHV:

        i)      CAHV supported programs that provide assistance to homeless or disabled veterans; and

        ii)      CAHV provided assistance to transitional facilities for homeless veterans.

    f)      Defendants' representations for CRN:

        i)      CRN provides therapy to children who have experienced trauma, children with cancer, disabled children, and breast cancer patients.

140.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 139, Defendants' sham charity clients spent little or none of the donors' contributions on the specified programs.

141.    Therefore, Defendants' acts or practices as set forth in Paragraph 139 are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(4) and 16 C.F.R. §310.3(d)(1) and (3).

**Count VIII**

**Failure to Comply with Entity-Specific Do Not Call Provisions in Violation of the TSR**

(As to All Defendants by All Plaintiffs)

142.     In numerous instances, Defendants have made outbound telephone calls to consumers who have previously stated that they do not wish to receive an outbound telephone call made on behalf of one of Defendants' charity clients for which Defendants are soliciting charitable contributions.

143.     Therefore, Defendants' acts or practices as set forth in Paragraph 142 violate the entity-specific Do Not Call provisions of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## CONSUMER INJURY

144.     Consumers are suffering and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, N.Y. Exec. Law Article 7-A and § 63(12), N.Y. Gen. Bus. Law § 349, the Virginia Solicitation of Contributions law, the Minnesota Charitable Solicitation Act, the Minnesota Uniform Deceptive Trade Practices Act, the New Jersey CFA, and the New Jersey CRIA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

145.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts,

restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

146.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Sections 4(a) and 6(b) of the Telemarketing Act, 15 U.S.C. §§ 6103(a) and 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

147.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiffs New York, Virginia, Minnesota, and New Jersey, to enforce their state law claims against Defendants in this Court for violations of N.Y. Exec. Law Article 7-A and § 63(12), N.Y. Gen. Bus. Law § 349; the Virginia Solicitation of Contributions law, Virginia Code §§ 57-48 to 57-69; Minnesota Charitable Solicitation Act, Minn. Stat. §§ 309.50 to 309.61; the Minnesota Uniform Deceptive Trade Practices Act, §§ 325D.44 to 325D.48; the New Jersey CFA, N.J.S.A. 56:8-1 to -20; and the New Jersey CRIA, N.J.S.A. 45:17A-18 to -40, including injunctive relief, the rescission or reformation of contracts, restitution, disgorgement of ill-gotten monies, attorney's fees, costs, civil penalties, and such other relief to which the State Plaintiffs may be entitled.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs FTC, New York, Virginia, Minnesota, and New Jersey, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b; the TSR, 16 C.F.R. Part 310; N.Y. Exec. Law §§ 63(12) and 175; N.Y. Gen. Bus. Law § 349; the Virginia Solicitation of Contributions law, Virginia Code §§ 57-48 to 57-69; the Minnesota Charitable Solicitation Act, Minn. Stat. §§ 309.50 to 309.61; the Minnesota Uniform Deceptive Trade Practices Act, Minn.

Stat. §§ 325D.44 to 325D.48; the New Jersey CFA, N.J.S.A., 56:8-1 to -20; the New Jersey

CRIA, N.J.S.A. 45:17A-18 to -40; and the Court's own equitable powers, request that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act; the

TSR; N.Y. Exec. Law §§ 63(12) and 175; N.Y. Gen. Bus. Law § 349; the Virginia Solicitation of

Contributions law, Virginia Code §§ 57-48 to 57-69; the Minnesota Charitable Solicitation Act,

Minn. Stat. §§ 309.50 to 309.61; the Minnesota Uniform Deceptive Trade Practices Act, Minn.

Stat. §§ 325D.44 to 325D.48; the New Jersey CFA, N.J.S.A. 56:8-1 to -20; and the New Jersey

CRIA, N.J.S.A. 45:17A-18 to -40 by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act; the TSR; N.Y. Exec. Law §§ 63(12) and

175; N.Y. Gen. Bus. Law § 349; the Virginia Solicitation of Contributions law, Virginia Code §§

57-48 to 57-69; the Minnesota Charitable Solicitation Act, Minn. Stat. §§ 309.50 to 309.61; the

Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.44 to 325D.48; the New

Jersey CFA, N.J.S.A. 56:8-1 to -20; and the New Jersey CRIA, N.J.S.A. 45:17A-18 to -40,

including rescission or reformation of contracts, restitution, the refund of monies paid, the

disgorgement of ill-gotten monies, and civil penalties;

C.      Require Defendants, pursuant to N.Y. Exec. Law §§ 63(12) and 175(2); Virginia

Code § 57-59(D); and the New Jersey CFA, N.J.S.A. 56:8-1 to -20, specifically N.J.S.A. 56:8-8,

to pay restitution and to disgorge all amounts Defendants received through the use of any of the

unlawful, unfair, or deceptive acts or practices alleged herein and order all funds received from

Defendants be directed to genuine, legitimate, charities that engage in charitable activities

44

substantially similar to those purportedly engaged in by the Defendants' charity clients described herein; and

D.     Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  9/14/20

Patricia B. Hsue*
Thomas Harris*
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, D.C. 20580
(202) 326-3132/phsue@ftc.gov
(202) 326-3620/tharris1@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

*      *Pro Hac Applications pending or forthcoming*

Dated: _____9/13/20_____

Yael Fuchs, Co-Chief, Enforcement Section**
Peggy Farber, Assistant Attorney General (PF 3083)
Sharon Sash, Assistant Attorney General (SS 7204)
William Wang, Assistant Attorney General (WW 7878)
Charities Bureau
New York State Office of the Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005
(212)  416-8391/yael.fuchs@ag.ny.gov
(212)  416-8785/peggy.farber@ag.ny.gov
(212)  416-6235/sharon.sash@ag.ny.gov
(212)  416-6026/william.wang@ag.ny.gov


Attorneys for Plaintiff
STATE OF NEW YORK


**      *Admission Pending*

46

Dated: _September 11, 2020_

Stephen J. Sovinsky*
Assistant Attorney General
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 823-6341
Facsimile: (804) 786-0122
ssovinsky@oag.state.va.us


Attorney for Plaintiff
COMMONWEALTH OF VIRGINIA

KEITH ELLISON
ATTORNEY GENERAL
STATE OF MINNESOTA

Dated: _9/10/20_

_[signature]_

Collin R. Ballou*
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN  55101-2130
Telephone: (651) 757-1474
Facsimile: (651) 296-7438
collin.ballou@ag.state.mn.us

Attorney for Plaintiff
STATE OF MINNESOTA

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

Dated: _9/14/20_

Monisha A. Kumar *
Deputy Attorney General
Consumer Fraud Prosecution Section
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Telephone: (973) 648-3070
Facsimile: (973) 648-4887
monisha.kumar@law.njoag.gov

Attorney for Plaintiff
STATE OF NEW JERSEY